And we have Mr. Daryl Dunham. Good morning, Your Honor. And we have Mr. Brett Barth. Barth. Barthee. Barthee Eppley. And you may proceed. Thank you, Your Honor. Back to briefly that the parties, Carol and Joseph, were married in the 1990s. Petition for dissolution of marriage was filed in 2006. It did not take until 2009 for that to be accomplished. After the judgment was entered, my client basically was a pro se until the fall of 2010 when I entered my appearance and endeavored to represent him. In 2009, my client, Joseph, remarried. He remained in Illinois. He remarried a woman in Missouri, close to Springfield, Missouri, where his father, who I don't want to say ailing, but I think it is without doubt that he was elderly and he was living alone, also lived. Can I ask where in Missouri? I wasn't able to pick up any distance between Perry County and where in Missouri. Well, I think the record is really unclear. His present abode is about 90 miles from Springfield, Missouri, is what the record indicates. What about Perry County, Illinois? I think you can take judicial notice of how far it is from Springfield, Missouri to Perry County. Well, I mean, it could be north, south, east, west of Springfield, Missouri. Which way from Springfield? Is it towards this way, 90 miles, or is it north, south, east? I think, Your Honor, it's about, and I don't think it's in the record, but it's my recollection from talking to my client is that it's about 90 miles north and east of Springfield. Wow. Anyway, in 2010, there was a marital home and he was given possession of that in the judgment of dissolution of marriage, and he sold that home. He used that home, the proceeds of the sale, I can paint off the mortgage, he had about $30,000. There seems to be a dispute in the briefs as to what that money was used for, but if you look at C232 and 239 of the record and in the transcript, it's 32 through 39. I think it's clear that what he did is he used that money to pay off the loan on his car. He used that money to pay off the loan on her car, and because he sold his home, he elected to move to Missouri to be closer to his wife, live with his wife, and be closer to his father. He did not have employment secured in Missouri. He mistakenly assumed, and you need to understand, he was pro se, and somewhere along the line he got the advice to fight for unemployment. Well, there were three appeals and he never got the unemployment. He made the record reveals and Judge Campanella, I think, found him to be credible on this, that he made in excess of 100 contacts to locate employment, eventually did find employment, but in the transcript T43, he says he went to Missouri, I'm just quoting Judge Campanella, expecting another job. He, if his testimony can be believed, and I do, tried everywhere to get a job and didn't get a job until November. At Siemens in Perry County, he was making $18 an hour. That was what his child support obligations predicated on, and the 28% was. The best he could find in Missouri was $10 an hour. Initially they gave him 40 hours a week, later it was reduced to 32 hours a week, and so he filed a petition for modification. Now, I want to point out some things about Judge Campanella's ruling in this matter. First, in paragraph three of his ruling, in the attendance it's at A5, in the record it's at C197, paragraph three. It is further undisputed that Mr. Eichmann, after terminating his employment, moved to Missouri to be with his father, who was in failing health, and eventually to remarry. That's just factually incorrect. That's not the fact. He remarried in 2009 while still living in Illinois, while still working at Siemens. And then in 2010, while he was living apart essentially with his spouse, that's when he sold the house. He had no place to live. He said, well, it's time for me to seek employment in Missouri. And it's unclear, but I think it's fairly obvious from the context of the order that was drafted and signed that Judge Campanella seemed to think that the facts were that my client sold his house, moved to Missouri, and then remarried, which I think is a radically different situation. Because then the only real motive that he could have had for moving to Missouri would have been the situation with his father. And by his own testimony, he sees him about once a week. But that's a radically different situation than a man who was married, has a spouse living 90 miles from Springfield, and deciding that he's going to have a normal married relationship with his spouse in Missouri. Now, it's also, I think, clear to me, and we argue this in our brief, that Judge Campanella applied the wrong standard in this case. At A7, in the final paragraph of this order, he says, since Respondent did not show good faith, this court does not have to answer the question of whether or not the move was prompted by a desire to obey financial responsibilities. Well, that is the test of good faith. That's the question that the judge has posed. That's the question that was litigated. That was the question that he was supposed to answer. Was my client's decision to voluntarily resign his employment and move to Missouri, was that motivated by a desire to obey his financial responsibilities to his children? Well, Judge Campanella doesn't even answer that question, yet he concludes that my client was acting in bad faith. Well, how can he have done that? And that is the very question that the courts in Illinois require him to address and answer. So are you saying it's almost purely a question of law with respect to whether or not someone can terminate employment in order to move to a different, in this case, location out of state, and ask for reduction of child support based on reduced working circumstances, and have it found in good faith? Is that purely a question of law under these facts? Your Honor, if I could be a little bit vague in answering your question, I think that this order could be read in such a way to mean that Judge Campanella thought that whenever somebody voluntarily resigns his employment without finding another position that was roughly equivalent in terms of remuneration such that it would not automatically under the 28% rule mean a reduction in support. That can never be good faith. Okay, I think you just basically said what I said. And I think then if that's what he did, then I think that needs to be reviewed de novo because the cases in Illinois make it very clear that there is not supposed to be a per se rule in these cases. Well, let me ask you this. I missed, when I read this earlier, that part of sentence three that says eventually to remarry. There's no question in this case that he did remarry about a year before he moved? Correct. And that's not going to be in dispute? Well, you'd have to ask Mr. Barkley about that, but if that becomes an issue, I'll be glad to submit a supplemental brief. I would be shocked if he's going to contest it. Well, is it in the record? Oh, yes, it is, Your Honor. It's very clear in the transcript that that's exactly what he did. He married first, lived separate and apart for the better part of a year, then moved to Missouri. The only thing that is pointed to in the order which would cause Judge Campanella to question my client's good faith is number one, he says, well, his testimony was self-serving. Well, how soon after his marriage did he resign his job in Illinois? About a year. Okay, about the same time he moved? Yes. When he sold the house, Your Honor, that's when he made the decision. He had no place to live. That's when he made the decision. Okay, I might as well start cohabitating with my wife, you know, the way married couples traditionally do. I don't see, and one of the reasons I think that Judge Campanella does not get to the question of whether the intent was to evade financial responsibilities is because in his statement at the end of the trial, he said he found my client to be credible in that he made a good faith effort to find work. Over 100 contacts. The best job he could find, Your Honor, was at $10 an hour. So he could not have made, having made that statement, he could not have founded my client, therefore went out and attempted to evade his financial obligations. In fact, the record, there's testimony that's undisputed that he made an effort, he made a good faith effort to find a job, and the best one that he could find was a $10 an hour job. So with regard to that prong of the test, it seems to me that my client, given the judge's statements for the record, has met that prong of the test. He went out, he went there, and he made over 100 contacts, and this was the best he could do. There was no intent to evade the financial responsibility, and Judge Campanello, given his statements from the records, agreed with that. Well, now, he does also make the statement, however, that it's undisputed and reiterated by response attorney and enforcement department that the respondent has recently been found to have attempted to report the failure to pay court-ordered child support. That fact, along with other considerations, can be looked at by the trial court in a determination of whether or not change in the disclaimer has made good faith, as opposed to whether it's prompted to evade financial responsibilities for supporting children. Your Honor, if you look in the record, basically what it shows is that my client was looking for work, tried to get an employment, never got it, used the access that he had from the sale of the house to pay the child support. When that money ran out, he had no money. So you're saying that this failure to be current child support didn't arise until after he did terminate employment? Correct. Correct. All of the findings with regard to contempt and the like occurred in 2010, after he sold the house and moved to Missouri. And you have to also understand, Your Honor, he was pro se for most of the year of 2010. And what does that have to do with it? Well, I think when I got involved, I told him, look, I don't care what kind of job you get, you've got to find something and you've got to stay current in your child support. The only thing that we can do at this point is you've got, you know, we can move to modify. But there's no showing of willfulness in the sense that my client had the financial ability to make these payments and refused to do so. You can search the records for a finding like that, and it just doesn't exist. In fact, the way he was able to purge himself of the contempt when I got involved is basically testified. He went to his new wife, and she's the one that made up the arrearages, which was not something that, you know, as a matter of law that she had any obligation to do, but as a practical matter, that's what happened. And I think that was probably what the strategy was anyway. So are we going to say that a history of – which I don't think is a substantial history at all because at the time of the trial, he was current – that a history of failure of contempt, I think a scant history, that alone calls into question my client's motive. There is no finding anywhere in this by Judge Campanella that my client lacked credibility. In fact, the only finding there is with regard to my client's credibility is in his favor. Does the court have to put a finding about who has the greater credibility? Well, if – I mean, it's entitled to make that, to arrive at its own conclusion, but does it have to put a finding in there? Well, then we're back to the legal issues then. Is it in the state of Illinois, as a matter of law, if the judge finds your testimony to be self-serving, which is my job, to develop the evidence to make it self-serving to him, and that he's had some contempt issues, as a matter of law, you can never get your child support reduced if you lose your job or voluntarily resign. Thank you. We'll have the opportunity to call rebuttal. Mr. Dunham, Mr. Barkey. Do you think the court was confused about when the respondent was married? The judgment – according to my brief, where I laid out the facts more in detail, the record does, in fact, show that the respondent remarried, if I may, on page 4 of my brief, remarried shortly less than 30 days after the judgment of dissolution was actually entered in June of 2009. So I believe the court was clear as to when that happened. I think it was just a misstatement in the order of Judge Campanella. So you're saying you think that that court was very clear that it was about a year difference between the time and that he just bespoke when he said that he eventually remarried after he left? That is our contention. His remarriage had been brought up in previous rules of the show causes since the judgment of dissolution was entered. Ms. Eichmann had filed a rule of show cause – and to correct Mr. Dunham – had filed her first rule of show cause on January 1, 2010, indicating that Mr. Eichmann had failed to pay his share of the medical expenses as well as the assigned marital debt pursuant to the judgment of dissolution of June of 2009. Mr. Eichmann was ultimately found in contempt in February of 2010 for his lack of payment. On June 3, 2010, Ms. Eichmann filed her second rule of show cause against Mr. Eichmann, again for nonpayment of medical expenses and for assigned marital debts. Was he current up until the time he terminated his employment? He was not current at the time that he terminated his employment, Your Honor. Was there a contempt petition? There was a contempt petition filed in January of 2010. Mr. Eichmann sold his residence and quit his job in June of 2010. So there was actually two rules of show cause filed. The date of his sale and the date of his quitting his job are unknown as far as the specific. All we know is that it was around June of 2010. Ms. Eichmann filed her second rule of show cause on June 3, 2010, again asking that Mr. Eichmann be held in contempt for nonpayment of medical expenses and marital debts that were assigned to him. There was essentially large credit card balances that, in the judgment of dissolution, Mr. Eichmann was responsible for. Collection agencies had then proceeded against Ms. Eichmann. Then, Your Honor, in September of 2010, Ms. Eichmann filed yet her third rule of show cause for nonpayment of child support and medical expenses. The court held a hearing on that matter in December of 2010, and Mr. Eichmann again was found – or I'm sorry, the court – I apologize. That rule of show cause was, in fact, filed after Mr. Eichmann had ceased his employment. Our contention, Your Honor, is Mr. Eichmann did, in fact, remarry in June of 2009. He stayed in the Perry County area, did not move. His wife has not changed residences since their marriage. Then Mr. Eichmann decides that he's going to sell his house. He sells his house, quits his job, and without prospects of new employment, he, in fact, leaves and now comes before the court saying, I would like a reduction in my child support. Our stance is that Mr. Eichmann, prior to quitting his job, should have sought what his options were as far as employment. It's fine, and I do believe that the court acknowledges that Mr. Eichmann was credible and that he searched over 100 places for employment. But just because he searched for employment doesn't necessarily establish that he had a good faith purpose in quitting his job, ultimately leaving no support for his children. Mr. Eichmann – I apologize. Mr. Dunn indicated that Mr. Eichmann first found a job for $10 an hour, 40 hours a week. That is simply not supported by the record. The record indicates that Mr. Eichmann – Mr. Eichmann's own testimony was that he found a job with the church for $10 an hour, and he was only going to be working approximately 20 hours a week. Upon cross-examination and providing Mr. Eichmann with proof of pay stubs, it appeared that Mr. Eichmann worked 32, 40, 42 hours. And when questioned about that, he indicated that he got in trouble for working the additional hours and was told that he could not work in excess of 30 hours. And I said – and the question was then asked of Mr. Eichmann, so you did not work 30 hours after this period of time? He indicated no, and we proceeded to show him three other pay stubs. I believe three. It may have been two that indicated he did, in fact, work over those hours. It is my belief that the court, based upon the rule to show causes, based upon Mr. Eichmann's testimony, is in the best position to determine whether or not Mr. Eichmann did, in fact, exercise good faith. And this court has held for numerous years that the standard for an abuse of discretion occurs only when no reasonable person – not every reasonable person, but no reasonable person – would take the view adopted by the trial court. The court had asked Mr. Dunham earlier his position with regards to whether or not willful was necessary. And I believe the courts have long held that absent a showing that Mr. Eichmann was willfully trying to evade his child support obligation or harm his children is not enough to establish that it's good faith. And so, therefore, we would ask with regards to that issue that the court affirm the trial court's decision with regards to that. Now, there are two other issues that Mr. Eichmann has proposed in his brief, and I'm not certain if he is going to touch on those in rebuttal, so I will take those currently. Those are that the court, by issuing the denial of the modification of child support, has denied Mr. Eichmann's right to travel, his constitutional right to travel, as well as his constitutional right to marry. Briefly, we would simply state that the court and the order does not even delve into Mr. Eichmann's ability to travel across state lines, and it certainly does not prohibit him from marrying anyone, and therefore those arguments are meritless. Thank you. Thank you. Mr. Dunn? Well, it's not clear to me that we can just gloss over the finding in paragraph three as, well, that's just a misstatement by Judge Campanella, and so we just ignore it. We're going to take, I guess, a black belt marker out, and we're going to just amend that and do that on review. It seems to me from the context of the order itself, that's what Judge Campanella assumed had happened, and that's just factually in error, and for that reason alone, we need to send this case back and get some further findings as to what has actually happened. I heard Mr. Murky say something like this, that my client, before he quit that job and moved to Missouri, he should have sought other employment, secured other employment, then he could have quit the job and moved to Missouri. That is just contrary to Illinois law in this proposition. Well, I do note that some of the cases that you cited generally talked about improving one's life condition, and where they, I'm not remembering the case name, but, for example, one of the individuals went back and went to law school, and the situation was overall one that would improve their life circumstance economically. I don't think there's a, for example, there's one case, Your Honor, I forget the name of it, where the guy went out on strike. He could have crossed that ticket line. The court found that that was not an intent to evade financial responsibility. He had other motives involved, and there was no showing in the case that when the work dispute actually settled that he got more wages. I don't think that the Illinois cases are holding that there is some kind of paramount obligation on the part of the support obligor to always see some kind of avenue where his financial obligations or her financial standards are going to stay the same, or going to improve. That's just not the law in Illinois. That's what Mr. Barkey seems to be urging on this court, and that seems to be the point of view that was embraced by Judge Campanella. There is a case, the Inlay case, and a couple of other cases say, well, simply because you show that your motives were not to evade your financial responsibility, that in and of itself doesn't mean that you win on the good faith standard. But I've never found a case in Illinois where an Illinois court has concluded the motives were correct under the standard intent to evade financial responsibility, but you were lacking in good faith for some other criteria. It is true that that is indicative. Now, with the standard, the way that's supposed to be done is that that question is supposed to be answered first.  What was the motive? And implicitly, Judge Campanella found that the client made a good faith attempt to find another work, and yet he doesn't see a need to address that question. There's all kinds of questions about this lawyer that are unanswered, and it needs to be sent back, and we need clarification. And hopefully the court will also offer its wisdom as to what the standard really is in the Fifth District, because it hasn't been as clearly defined in the Fifth District as it's been in some of the other districts. Thank you. Thank you, Mr. Dunham. Mr. Barkey, interesting case. We'll take the matter under advisement.